UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:17-CR-101-DCR-REW |
| | ) | |
| v. | ) | |
| | ) | RECOMMENDED DISPOSITION |
| NESTOR BARRON, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Defendant, Nestor Barron, by counsel, moved to suppress the fruits of law enforcement's July 18, 2017, search of 629 Dartmoor Drive in Lexington. DE #31 (Motion to Suppress). The United States responded in opposition. DE #33 (Response). Defendant replied. DE #46 (Reply).[1] The Court has reviewed the entire record, including the parties' briefs, the warrant and other attachments, and the applicable law. The matter is ripe for consideration. For the following reasons, the Court **RECOMMENDS** that the District Court wholly **DENY** the motion to suppress (DE #31).

## I.     BACKGROUND / THE AFFIDAVIT

Matt Evans, a Lexington Police Department Detective with approximately 20 years of experience, 13 as a narcotics detective, swore to the affidavit at issue before and obtained a search warrant from Fayette District Judge Megan Thornton on July 17, 2017. *See* DE #31-1. The affidavit targeted cocaine and heroin trafficking evidence at 629 Dartmoor Drive, Lexington,

---

[1] Judge Reeves denied the motion as moot given the Superseding Indictment; the Court then, after consulting the parties, reinstated the motion and deemed the matter submitted. DE #51.

Kentucky, in two vehicles, and on the person of a named individual. *See id.* Based on the affidavit, Judge Thornton found probable cause and issued the search warrant on the date of application. Defendant now challenges warrant validity on two bases, seeking suppression.

The affidavit tells a largely cohesive story of Fernando Lara Salas's[2] drug trafficking and its connection with 629 Dartmoor Drive. Defendant Barron is not mentioned; law enforcement merely located him in the residence (though with much cash and coke) upon warrant execution. Thus, Barron, though the current movant, *see also* DE #33, at 8 n.2 (United States conceding his standing to challenge the search), is not among the cast of affidavit players.

Evans began by swearing to Judge Thornton that he received information from "several qualified confidential informants" that Lara Salas "is selling large amounts of cocaine and heroin." DE #31-1, at 4. Evans had "been receiving this information since early 2012." *Id.* Per Evans, Lara Salas's son ("Fernando Garcia Jr."), wife ("Nancy Garica-Zapata" [sic]), and a person named "Jorge Macias" (now an indicted Co-Defendant) assisted Lara Salas "with his illegal drug trafficking operations." *Id.* Evans told Judge Thornton that the CIs have worked with him "for several years," providing "valuable information" that had previously "led to numerous arrests and large seizures of drugs and currency." *Id.* The application reports quantities of cash and drugs interdicted via CI efforts. Evans had previously found the CIs "to be accurate, reliable, and trustworthy." *Id.* Further, Evans himself had "verified" the provided information "via independent investigations." *Id.* Simply put, Evans affirmed that the CIs were highly reliable

---

[2] Lara Salas, per the affidavit and warrant, has many aliases. *See, e.g.*, DE #31-1, at 1. The Court, for consistency, uses "Lara Salas" throughout this Recommendation to identify the principal target of Detective Evans's investigation. *Accord* DE ##31 (Defendant's brief), at 3 (recognizing that "Fernando Garcia" was "indicted in this case as Fernando Rafael Lara Salas"); 33 (United States's brief), at 2 n.1.

sources of information in a drug investigation, as past work and his own independent actions verified here.

The affidavit thoroughly describes law enforcement's long-term investigation targeting Lara Salas. Post-2012-information-receipt, Evans first describes a February 2013 search of 1051 Duval Street, where police seized 45 kilograms of cocaine (worth $1.5 million), with Lara Salas's fingerprints located on cocaine packaging. Lara Salas "was federally indicted on these cocaine trafficking charges, plead guilty, and was deported." DE #31-1, at 5. Evans also describes his own personal surveillance of Lara Salas, who "had been living on Produce Lane in Lexington until he was arrested in Baltimore[,] Maryland in November 2013." *Id.* Evans personally met Lara Salas as part of an aborted cooperation ruse post-arrest. *Id.* The United States deported Lara Salas in October 2014. Then, in "April 2016," Evans swore, the involved CIs notified him that Lara Salas "had returned to Lexington and had continued to sell large amounts of cocaine and heroin." *Id.* Indeed, the CIs "advised that they had heard that Nancy and [Lara Salas] had recently purchased a house." *Id.* at 6.

"During the first week of August,"[3] Evans told Judge Thornton, he "was conduct[ing] surveillance in the area of Dartmoor Drive." DE #31-1, at 6. As background, Evans explained that he had previously (date unknown) executed a separate search warrant at 629 Dartmoor, locating "over 12 ounces of cocaine and $9,000 cash" belonging to Humberto Alvarez, who "is now a fugitive from justice and has fled the Lexington area." *Id.* Evans "was checking 629 Dartmoor Drive to see if Alvarez had returned." *Id.* He never eyed Alvarez, but the Detective did

---

[3] Evans, unfortunately, did not include which year this occurred. In context, though, it is reasonably clear that Evans is referring to August 2016. Remember that a reviewing court reads an affidavit in a common-sense, not hypertechnical, manner. *Illinois v. Gates*, 103 S. Ct. 2317, 2331-33 (1983). The event obviously was after Lara Salas's deportation and return, and Evans had not learned of the return until 2016.

3

spot 3 cars—a red Camry, a blue Avalanche, and a grey Charger—in the 629 Dartmoor driveway. *Id.* The Camry matched the car that the CIs previously told Evans that Nancy drove. *See id.* Further, Evans "ran the registration plate" on the Camry and Charger, and each returned to either Lara Salas or Nancy. *Id.*

Based on Evans's surveillance at 629 Dartmoor "on numerous occasions at all hours of the day and night," he swore to the Fayette District Judge that the home "is Nancy and [Lara Salas]'s primary residence." DE #31-1, at 6. Evans "observed both Nancy and [Lara Salas] coming and going from this location on numerous occasions." *Id.* Evans noted that Lara Salas had been secretive about—"gone to great lengths" to keep secret—the location. Because neither target had told any of the multiple CIs about this residence, Evans felt, given his training and experience, "that this is where they are storing their cocaine, heroin, and large sums of cash." *Id.*

The investigation continued. "On January 16, 2017," Evans "contacted Cincinnati DEA TFO Chad Whitford and gave him the details of the [Lara Salas] drug trafficking operation and that the CI's [sic] advised that [Lara Salas] had several customers in the Cincinnati[,] Ohio area." DE #31-1, at 7. The same day, Evans observed Lara Salas "as he traveled North of I75 towards Cincinnati, Ohio." *Id.* (all as in original). "At approximately 2:45 p.m.," Lara Salas, his son, Macias, and another "unknown male Hispanic" arrived at 1429 Ambrose Avenue in Cincinnati. *Id.* "This is a known area of travel" for Lara Salas; Evans "and assisting investigators" observed him there "on numerous occasions." *Id.* The group of men, using a key, then entered the house. Around 4:45 p.m., a black Infinity arrived at the home. *Id.* A black man later identified as Robbie Warren "exited the vehicle carrying an orange Nike duffel bag," which officers noted "appeared weighted and shaped as if bricks of U.S. [c]urrency were inside the bag." *Id.* Warren entered the

home and "a short time later" exited sans duffel bag. *Id.* After Warren left, the original group exited the home, departed, and "traveled back to Lexington." *Id.* Evans believed this interaction was a money exchange related to the sale of illegal narcotics. *Id.* Police continued to observe Warren—who has a felony cocaine trafficking record—treating Ambrose as a likely stash house.

As the investigation was ongoing (though with no precise date provided), a CI contacted Evans and advised that Lara Salas and Macias "had provided him/her with a quantity of heroin," provided "as a representative sample of much larger amounts which [Lara Salas] and Macias [we]re selling." DE #31-1, at 8. "Just prior to this transaction," Evans observed Lara Salas and Macias "leave the residence at 629 Dartmoor Drive." *Id.* "After this transaction," Evans observed the pair "return to" 629 Dartmoor. *Id.* Lara Salas and Macias "advised that they had kilogram quantities of heroin for sale." *Id.*

Based on "months and months of surveillance" and observation of daily travel by Lara Salas and associates to Cincinnati, Evans averred that he had established probable cause to believe that Lara Salas was "running a large scale cocaine and heroin trafficking operation out of his residence at 629 Dartmoor Drive, Lexington Ky., coupled with the stash house at 1429 Ambrose Avenue Cincinnati Ohio." DE #31-1, at 8 (all as in original). "Through years of training and experience," Evans had "learned that on almost every occasion drug traffickers keep evidence of their drug trafficking activities at their primary residence," which is true even when they "utilize a separate stash location." *Id.* In fact, Evans swore to the issuing judge that this is actually "the preferred method so if the stash house is located and the valuable drugs are lost the currency which is kept at a separate location may not be found." *Id.* (all as in original). When

Evans has encountered use of a stash house "there has always been evidence of drug trafficking located at the suspect's primary residence." *Id.*

Evans continued to recount particular instances of narcotics connections with Lara Salas. For example, an April 13, 2017, interview with defendants from a separate case revealed that "they had sold [Lara Salas] multiple kilograms of heroin on multiple occasions." DE #31-1, at 8. A June 1, 2017, interview of "a high level cocaine trafficker" (resulting from a May 1, 2017, arrest with 22 kilos) revealed Lara Salas's "desire" to purchase "multiple kilograms of cocaine." *Id.* at 9. When the trafficker received his shipment, he contacted Lara Salas, who declined an exchange, citing receipt of "his supply from another source." *Id.*

Finally, "within the past 72 hours" prior to making the affidavit, one of the involved CIs contacted Evans and advised that Lara Salas and Macias "had recently received another drug shipment." *Id.* The CI arranged for a delivery of a quantity of heroin. Evans observed Macias arrive, operating Lara Salas's Avalanche, and provide the CI "a quantity of suspected heroin and advise[] that he and [Lara Salas] had large amounts for sale." *Id.* Lara Salas and Macias, per Evans, "do everything together." DE #31-1, at 9. "Every morning Jorge Macias will travel to [Lara Salas]'s residence at 629 Dartmoor Drive and pick him up. They are using their above described vehicles to facilitate their drug trafficking activities as well as to transport drugs and currency during these illegal activities." *Id.* They also, per Evans, used "their residences to store their illegal narcotics, drug trafficking paraphernalia, and drug trafficking proceeds." *Id.*

Based on this affidavit, Judge Thornton found probable cause and issued a warrant authorizing a search of 629 Dartmoor Drive (among other things) on July 17, 2017. *See* DE #31-1, at 1 (Warrant). Law enforcement executed the warrant on July 18, 2017, and "discovered the

defendant, Nestor Barron, in a bed in the residence along with incriminating evidence." DE #31 (Motion), at 1. Barron now challenges warrant validity on two grounds. He contests the nexus between trafficking information and the Dartmoor Drive location. He also claims the underlying information, at least as to that location, was stale. In essence, capturing both theories, he claims there was not probable cause indicating evidence at Dartmoor Drive when Judge Thornton issued the warrant. The Court disagrees, finds the warrant valid, and recommends **DENIAL** of the motion to suppress.

## II.   THE AFFIDAVIT ESTABLISHED AN ADEQUATE NEXUS BETWEEN THE ILLEGAL ACTIVITY AND 629 DARTMOOR DRIVE.

First, Defendant argues that the affidavit failed to establish an adequate nexus between the illegal activity and 629 Dartmoor Drive. DE #31, at 3-8. The United States responded. DE #33, at 8-12. Defendant replied. DE #46, at 4-5.

"[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. Probable cause consists of "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). To determine probable cause, an issuing judge must examine the totality of the circumstances and find "a fair probability that contraband or evidence of a crime will be found **in a particular place**." *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009) (internal quotation marks omitted; emphasis added). A supporting affidavit must, therefore, sufficiently demonstrate the existence of a "nexus between the place to be searched and the evidence sought." *United States*

*v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)).

When evaluating whether a warrant application presented probable cause, a reviewing court must accord "great deference" to the issuing judge's determination. *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006). Such deference ensures than "an issuing [judge's] discretion [will] only be reversed if it was arbitrarily exercised." *See United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc). The reviewing court must uphold the issuing judge's probable cause determination if a "substantial basis" existed for the judge to conclude "that a search would uncover evidence of wrongdoing." *Illinois v. Gates*, 103 S. Ct. 2317, 2331 (1983); *Allen*, 211 F.3d at 973. Additionally, line-by-line scrutiny of a supporting affidavit is inappropriate, *Jackson*, 470 F.3d at 306 (citing *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004)), and a reviewing court must limit its analysis to the "information presented in the four corners of the affidavit." *Id.*; *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005). When the search at issue occurred pursuant to a warrant, the defendant has the burden of establishing a prima facie case that the search was illegal. *United States v. Murrie*, 534 F.2d 695, 697-98 (6th Cir. 1976); *see also United States v. Franklin*, 284 F. App'x 266, 275 (6th Cir. 2008) (Clay, J., dissenting). The Court examines the affidavit at issue through a prism of common sense. *Gates*, 103 S. Ct. at 2331, 2333.

At bottom, as to this argument, to "establish probable cause necessary for [a] search warrant, the supporting affidavit must set forth a nexus between the place to be searched and the evidence sought. . . . The task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before h[er], there is a fair

probability that contraband or evidence of a crime will be found in a particular place." *United States v. Penney*, 576 F.3d 297, 311 (6th Cir. 2009) (internal quotation marks, alteration, and citations removed).

Barron's argument, on this record, fails. The particulars of Evans's affidavit plainly established a sufficient nexus between the targeted heroin and cocaine trafficking, the fair expectation of evidence, and 629 Dartmoor Drive. Evans's independent investigation, that of other law enforcement officers, information received from qualified CIs, and Evans's experience-based opinions created a reasonable basis to believe that Lara Salas was a current large-scale heroin and cocaine trafficker, that Lara Salas lived at 629 Dartmoor Drive, and that a connection existed between Lara Salas and 629 Dartmoor regarding his ongoing drug trafficking activities.

The affidavit easily presented probable cause that Lara Salas trafficked cocaine and heroin. *See* DE ##31 (Motion), at 3 (conceding such); 46 (Reply), at 4 (conceding that the affidavit "in the present case . . . is replete with information that [Lara Salas] is a drug dealer"). Indeed, Lara Salas clearly was a long-term, high quantity trafficker. The evidence included: the 2013 felony conduct and later deportation; the Baltimore arrest relative to a 2 kilo alleged deal; indication that Arizona charges also existed at the time of the 2013 arrest; the 2017 de-briefs, indicating high volume exchanges with known, current traffickers; the CI information; the multiple aliases; the evident house purchase, acquisition information, and absence of gainful employment; and, the observed, repetitive conduct involving Cincinnati, including Lara Salas's control over a suspected stash house.

The specific connection with 629 Dartmoor chiefly begins in April 2016, when CIs notified Evans that Lara Salas had returned to Lexington and to large-quantity heroin and cocaine trafficking (indeed, as a family affair, involving his wife, son, and other associates). Those very CIs advised Evans that Lara Salas and his wife, Nancy, had recently purchased a home. They reported ostentatious spending by the couple, per social media. Then, in August, Evans had returned to Dartmoor Drive to follow up on a separate investigation. While around 629 Dartmoor, though, Evans observed three cars in the driveway, two of which a registration plate search returned as linked to Lara Salas or Nancy. Further, the Camry matched the CIs' description of Nancy's car and an Avalanche matched the model of Lara Salas's alleged vehicle. Evans, interest piqued, surveilled 629 Dartmoor "on numerous occasions at all hours of the day and night" and observed Lara Salas and Nancy "coming and going from this location on numerous occasions."

Then, critically, during the investigation, a CI contacted Evans and advised that Lara Salas and Macias "had provided him/her with a quantity of heroin," provided "as a representative sample of much larger amounts which [Lara Salas] and Macias [we]re selling." "Just prior to this transaction," Evans himself observed Lara Salas and Macias "leave the residence at 629 Dartmoor Drive." "After this transaction," Evans observed the pair "return to" 629 Dartmoor Drive. Lara Salas and Macias "advised that they had kilogram quantities of heroin for sale." Further, Evans told Judge Thornton that Lara Salas and Macias "do everything together," including Macias (who utilized Lara Salas's vehicle when conducting a July 2017 drug transaction) picking Lara Salas up "every morning" at 629 Dartmoor Drive and normally traveling to Cincinnati.

The affidavit did not specify the date of the CI heroin-sample delivery. This unfortunate omission provides fodder for Barron, but the Court views the event as likely occurring between January 2017 and the application (and certainly between August 2016 and the application). First, its placement in the affidavit comes after discussion of the January Cincinnati conduct. This, logically, implies a later event in the context of the affidavit's structure. Second, the sample instance involved both Lara Salas and Macias. The affidavit first references Macias relative to the January 2017 conduct, so it makes sense that the next transaction involving Macias occurred after his first appearance on the scene. Finally, Evans did not even associate Lara Salas with Dartmoor until August 2016; the event undoubtedly occurred after that date.

Judge Thornton had a substantial basis to believe that 629 Dartmoor Drive was Lara Salas's present residence and that evidence of heroin and cocaine trafficking would be found there. To recount and summarize, Evans informed Judge Thornton of the following: (1) CIs' knowledge, in April 2016, that Lara Salas and his wife recently returned to Lexington and purchased a home;[4] (2) subsequent observation of Lara Salas's and Nancy's vehicles in the 629 Dartmoor driveway;[5] (3) Evans's 360° surveillance of Lara Salas and Nancy "coming and going" from 629 Dartmoor "on numerous occasions"; (4) Evans's observation of Lara Salas and his

---

[4] Evans could undoubtedly cite to, and Judge Thornton could undoubtedly rely on, information received from the multiple CIs in this case. The inquiry probes the totality of the circumstances, giving consideration to the CIs' veracity, reliability, and basis of knowledge. *See, e.g.*, *United States v. Thomas*, 605 F.3d 300, 307-08 (6th Cir. 2010); *United States v. Dyer*, 580 F.3d 386, 390-91 (6th Cir. 2009). Independent police corroboration is also an important factor. *Dyer*, 580 F.3d at 390-91. The circumstances here include Evans's "several years" of experience with the CIs; their expressed historical value, accuracy, reliability, and trustworthiness; and the independent confirmation of the Lara Salas-related information, via, *e.g.*, the samples, that Lara Salas did return, confirmed Cincinnati activity, and the vehicle cross-match. Judge Thornton quite validly considered information from CIs in assessing this warrant application.

[5] The affidavit indeed reports two vehicles as currently "registered to [Lara Salas] at 629 Dartmoor Drive." DE #31-1, at 3.

associate Macias leave 629 Dartmoor "just prior" to the confirmed heroin transaction with a CI;
(5) Evans's observation of Lara Salas and Macias "return to" 629 Dartmoor immediately
following this transaction; (6) the proof throughout the affidavit, based on information from
qualified CIs and law enforcement's independent investigation, painting Lara Salas as a current,
large-scale heroin and cocaine trafficker, including the connection with Warren and 1429
Ambrose Avenue, other trafficking defendants' interview statements, and (of course) the direct
indications of heroin distribution with one or more CIs; (7) the investigative conclusion that
Macias picked Lara Salas up "every morning" at 629 Dartmoor to engage in the drug trafficking
endeavor; and (8) Macias, using Lara Salas's Avalanche, delivered drugs to a CI mere days prior
to the affidavit.[6]

Further, "an issuing judge may infer that drug traffickers use their homes to store drugs
and otherwise further their drug trafficking." *Penney*, 576 F.3d at 311; *United States v. Williams*,
544 F.3d 683, 687 (6th Cir. 2008) (citing cases). Here, the affidavit relates continuing heroin and

---

[6]    Barron's specific arguments to the contrary are unconvincing. For instance, Barron
insinuates that because the affidavit explains that Lara Salas "spends the majority of each day" at
1429 Ambrose Avenue in Cincinnati, perhaps that address is in fact his residence. DE #31, at 6.
That, to the Court, upon review of the affidavit, is nonsensical. The affidavit clearly paints a
picture of Lara Salas and his wife living at 629 Dartmoor and of Lara Salas then traveling daily
to 1429 Ambrose (reasonably viewed as the stash house) to further the drug trafficking activities.
Many (perhaps most) people "spend the majority of each day" away from their residences; this
defensive argument has no logical or record traction, to the Court.
    Additionally, as to another Barron argument, *see id.*, the Court obviously does not see the
disconnected Alvarez-related search of 629 Dartmoor as relevant to the probable-cause analysis.
Probable cause easily exists without consideration of that unrelated event, which Evans
seemingly included in the affidavit merely for purposes of background / explanation, *i.e.*, what
drew Evans back to Dartmoor.
    Finally, to the extent Barron argues that Judge Thornton could not have validly relied on
any of the above information due to some of its aged or undated nature, the Court rejects such a
theory; the affidavit's concluding 72-hour proof cures any staleness concerns and refreshes the
prior investigative information, per the discussion below. *See infra* Section III. Moreover, the
trafficking history is part of the full and fair Lara Salas portrait.

cocaine trafficking activity by Lara Salas, from which Judge Thornton could, in this context, infer that evidence of such trafficking would be found at Lara Salas's residence. *Williams*, 544 F.3d at 687; *see also id.* at 686-87 (countenancing "the Government's logical, and indeed legally correct, assertion that it is reasonable to suppose that some criminals store evidence of their crimes in their homes, even though no criminal activity or contraband is observed there." (internal quotation marks removed)).

This is consistent with the Sixth Circuit's recent decision in *United States v. Brown*, 828 F.3d 375 (6th Cir. 2016), which the parties discuss at some length in the briefing. In *Brown*, the Sixth Circuit recognized that it "ha[s] permitted judges to infer a fair probability of finding evidence in a residence even though the affidavit did not state that such evidence had been observed directly." *Id.* at 383. The Circuit reiterated, though, that it has never held that "a suspect's status as a drug dealer, *standing alone*, gives rise to a fair probability that drugs will be found in his home." *Id.* (internal quotation marks removed; emphasis added). "Rather, [the Circuit] ha[s] required some reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence; that is, [the Court of Appeals] ha[s] required facts showing that the residence had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence." *Id.* Alternatively, the Sixth Circuit has "found the nexus sufficient even though the affidavit did not contain facts showing that the residence had been used in drug trafficking" when "the affidavit[] did not just establish that the defendant[] w[as a] drug dealer[], but contained overwhelming evidence that the defendant[] w[as a] major player[] in a large, ongoing drug trafficking operation." *Id.* at 383 n.2. Under either recognized

*Brown* nexus-sufficiency theory, the Court concludes, considering all the factors discussed above, that this affidavit and warrant survive scrutiny.

In circumstances where, as here, police "independently corroborated [the] fact that the defendant[] w[as a] known drug dealer[] at the time the police sought to search [his] home[,]" a sufficient nexus may validly exist. *United States v. McPhearson*, 469 F.3d 518, 524, 524 n.3 (6th Cir. 2006) (finding an insufficient nexus where any "allegation of drug dealing was absent from the affidavit supporting the warrant"); *see also United States v. Jones*, 159 F.3d 969, 974-75 (6th Cir. 1998). Such is the case here—where law enforcement independently corroborated what the CIs told them and tied—via, *e.g.*, the "representative sample" heroin transaction that Lara Salas's trips from and to 629 Dartmoor bookended, Lara Salas's lack of transparency with the CIs concerning his residency, Evans's investigative conclusion that Macias picked Lara Salas up "every morning" at 629 Dartmoor to further the drug enterprise, and Evans's conclusions based on his 20 years of training and experience—the cocaine and heroin trafficking operation to the 629 Dartmoor Drive residence. Evans's particular opinions carry weight and deserve particular mention. *See, e.g.*, *United States v. Blair*, 214 F.3d 690, 696 (6th Cir. 2000) (crediting an officer's "professional opinion that drug traffickers keep financial records at their homes" as a factor supporting warrant issuance). This affiant did not include mere boilerplate expertise. Rather, based on his decade-plus experience as a narcotics detective, Evans opined that Lara Salas's secrecy about his residence with the CIs indicated that he wanted to protect from contraband discovery. Further, once Evans established that Lara Salas controlled a stash house in Cincinnati, Evans made pointed observations about how traffickers operate under a stash house-primary residence model. He stated that the trafficker normally is thus separating elements of the

14

operation to minimize loss "if the stash house is located." This dovetails with the residential secrecy. Further, Evans stated that in "all of these occasions," *i.e.*, those involving a stash house as distinct from a primary residence, "there has always been evidence of drug trafficking located at the suspect's primary residence." DE #31-1, at 8.[7] These opinions, honing in on elements particular to Lara Salas, strongly support Judge Thornton's warrant issuance.

Alternatively, even without these connections, Evans's affidavit contains overwhelming evidence that Lara Salas was a major player in a large, ongoing drug trafficking operation, validating Judge Thornton's nexus finding. This is clearly not a case where Judge Thornton authorized a search of 629 Dartmoor based on nothing more than Lara Salas's status as a simple drug dealer. Consider the logic and the factual record here: The affidavit undoubtedly shows Lara Salas as a long-term, high-volume drug trafficker. That behavior runs from 2013 through 2017. The evidence suggests that Lara Salas controls multiple vehicles involved in the conduct (the Camry taken to Cincinnati, the Avalanche used by Macias). Further, Lara Salas controls (has a key to) the Ambrose house in Cincinnati. The CIs depict Lara Salas and his wife (and only the wife works, as a part-time waitress) as having bought a house and spent lavishly. With all of that in the affidavit, surely there is a "fair probability" that evidence associated with the continuing trafficking operation would be found in the primary residence. That evidence could include drugs, but it also fairly could include proceeds, safes, papers, and other confirmatory evidence of

---

[7] The defense cherry-picks a seemingly (but not actually) conflicting opinion from a different agent in the trailer search warrant issued later by Judge Atkins. That warrant targeted remote storage, but even it contained multiple opinions tying trafficker residence and evidence of crime. *See, e.g.,* DE #31-2, at ¶¶ 4.a.; 4.c.; 4.d. It is hardly surprising that an organization or person operating illegally would choose to house contraband, incriminating items, and proceeds at multiple locations, both within and remote from the primary residence of the actors. That is precisely what occurred here.

illegality. Rigid and hypertechnical warrant parsing, as a route to escape these observations, is not consistent with *Gates*.

Thus, in either scenario, because there was a reasonable basis to believe that Lara Salas lived at 629 Dartmoor Drive and that he currently trafficked cocaine and heroin with a connection to the residence, or because the affidavit clearly showed Lara Salas as a major player in a large, ongoing drug trafficking operation, and because a court can reasonably, in such circumstances, infer that a trafficker keeps evidence of the crime in the residence, *Brown*, 828 F.3d at 382-84; *Penney*, 576 F.3d at 311, Judge Thornton reasonably authorized a search of 629 Dartmoor consistent with Evans's experience-based opinions.

Law enforcement conducted a thorough, years-long investigation. Officers began probing the actions of an illegal alien returnee to large-scale heroin and coke trafficking, via independent investigation and several well-qualified and reliable CIs, who identified Lara Salas and associates as key trafficking players. Plainly, the totality of the evidence, viewed in a common-sense manner, supports warrant validity. There was a sufficient nexus between drug activity and 629 Dartmoor via Lara Salas's continued trafficking, the evidence of his residence there, the particularized evidence of a deal originating there, and the use by Macias of a vehicle linked to the residence. The facts, viewed as a whole, confirm Judge Thornton's quite reasonable belief— far more than a mere suspicion—that Lara Salas distributed cocaine and heroin and that evidence of such would be found at 629 Dartmoor Drive. Evans presented plenteous facts, gathered over years of independent police investigation and work with CIs, that supported warrant issuance, and he offered specific, bolstering opinions. Judge Thornton had a substantial basis on which to issue the warrant based on the totality of the evidence presented in the affidavit.

16

### III.   THE INFORMATION IN THE AFFIDAVIT WAS NOT STALE.

Defendant next argues that the affidavit contained stale information. DE #31, at 8-9. The United States responded. DE #33, at 12-13. Defendant replied. DE #46, at 5-7.

Stale information cannot, at least alone, provide the basis for probable cause. *United States v. Frechette*, 583 F.3d 374, 377-78 (6th Cir. 2009) (citing *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)); *see also Marcillis v. Twp. of Redford*, 693 F.3d 589, 601 (6th Cir. 2012). This is because the probable cause determination "is concerned with facts relating to a presently existing condition[.]" *Spikes*, 158 F.3d at 923 (internal quotation marks omitted) (quoting W. LaFave, *Search and Seizure* § 3.7 at 338 (3d ed. 1996)). "The staleness inquiry depends on the inherent nature of the crime." *Frechette*, 583 F.3d at 378 (internal quotations marks omitted). "In the context of drug crimes, information goes stale very quickly because drugs are quickly sold and consumed[,]" but "evidence that criminal activity is of an ongoing nature will defeat claims of staleness." *Marcillis*, 693 F.3d at 601 (internal quotation marks omitted). To evaluate staleness, the Court considers the following: (1) the character of the crime; (2) the criminal; (3) the thing to be seized; and (4) the place to be searched. *Frechette*, 583 F.3d at 378 (citing *United States v. Abboud*, 438 F.3d 554, 572-73 (6th Cir. 2006)). The staleness test does not "create an arbitrary time limitation within which discovered facts must be presented[.]" *Spikes*, 158 F.3d at 923 (quoting *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988)). The "critical question is whether the information contained in the affidavit, when presented to the . . . judge, established that there was a fair probability that [particular evidence] would still be found at" the residence. *Id.*

17

The Court has fully considered the *Frechette* factors and finds, viewing the situation as a whole, that the evidence here of large-scale and ongoing heroin and cocaine trafficking is not stale—and quite obviously so, on these facts.

Evans's affidavit established ongoing trafficking by Lara Salas via a thorough investigation stretching back to 2012 and ramping up in April 2016, when Lara Salas returned to Lexington post-deportation and re-commenced trafficking. The intense subsequent 15-month investigation Evans described plainly gave Judge Thornton a reasonable basis to believe that Lara Salas was engaged in an ongoing trafficking enterprise, and "where there is evidence that a suspect is engaged in an ongoing drug operation," the presumption of rapid staleness in drug cases does not necessarily apply. *See United States v. Duncan*, No. 3:11-cr-12-14, 2012 WL 3042945, at *5 (M.D. Tenn. July 25, 2012) (citing *Frechette*, 583 F.3d at 378 (countenancing quick drug-evidence staleness "in the absence of information indicating an ongoing and continuing narcotics operation")); *see also* DE #46 (Reply), at 5 (conceding that the "conspiracy set out in the affidavit is alleged to be ongoing"). The Sixth Circuit has directly held: "Evidence of ongoing criminal activity will generally defeat a claim of staleness." *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001). "Moreover, where the criminal activity occurred in a 'secure operational base,' the passage of time becomes less significant." *Id.*; *see also United States v. Figueroa*, No. 5:12CR456, 2013 WL 66153, at *2-3 (N.D. Ohio Jan. 4, 2013) ("The Sixth Circuit has determined that evidence of ongoing criminal activity defeats staleness; and the age of information is less important when the place to be searched is the suspect's home, suggesting permanence."). Both those elements are fully present on these facts.[8]

---

[8] Additionally, Evans swore to many statements in the present or a continuing tense; he affirmed that "he now has" and that he believed "there is now" evidence of drug trafficking at 629

Most critically, Evans swore to Judge Thornton that "**within the past 72 hours**," a CI contacted him and advised that Lara Salas and Macias "had recently received another drug shipment," consistent with the observed patterns of suspected criminality in the investigation to that point. DE #31-1, at 9 (emphasis added). The CI, monitored by law enforcement, arranged a meeting with Macias (who arrived driving Lara Salas's Avalanche), and Macias provided the CI with "a quantity of suspected heroin and advised that he and [Lara Salas] had large amounts for sale." Again, this was **within 3 days** of Evans seeking the warrant and **within 4 days** of the search; the information was current, not stale. *See, e.g.*, *United States v. Carnahan*, 684 F.3d 732, 736 (8th Cir. 2012) ("The third buy, made within 72 hours of the warrant applications, can hardly be deemed stale information."); *United States v. Bryant*, 145 F. App'x 95, 98 (6th Cir. 2005) (rejecting out of hand a staleness argument when a CI "told police that he had been inside Murphy's apartment and had seen cocaine there within the last 72 hours"); *United States v. Garrett*, 292 F. App'x 3, 5 (11th Cir. 2008) ("[T]he officer obtained the search warrant within 72 hours of engaging in a controlled drug buy at the residence. Thus, any potentially stale information was updated and substantiated. Moreover, the search was to take place at a location that was believed to be involved in an ongoing drug-trafficking conspiracy and was occupied by a member of the conspiracy, such that the information would not be stale."). Information of such immediacy and freshness, coupled with the plain evidence of Lara Salas's ongoing and large-scale drug operation, surely was not stale and indeed kept fresh the more aged or undated investigative information. *See Greene*, 250 F.3d at 481; *Spikes*, 158 F.3d at 924.

---

Dartmoor. DE #31-1, at 3. He told Judge Thornton that Lara Salas "is selling large amounts of cocaine and heroin" and that he (Evans) "has been receiving this information since early 2012"—indicating (as the facts indeed show) such receipt continued at the time of affidavit signing. *Id.* at 4.

The affidavit, thus, established a fair probability that drug trafficking evidence would be found at 629 Dartmoor Drive. *Spikes*, 158 F.3d at 923. The Court, on this record, easily concludes that evidence of Lara Salas's cocaine and heroin distribution was not stale—indeed, his actions persisted over a lengthy period, documented in the affidavit, until 3-4 days before warrant execution. Lara Salas was engaged in ongoing criminal activity, based at his home, with a confirmed heroin handoff 72 hours prior. Evidence of criminality and probable cause as to the search was sufficiently current.

## IV.    CONCLUSION

The affidavit established a sufficient nexus between illegal activity and the residence, and the information was not stale.[9] Accordingly, the Court **RECOMMENDS** that the District Court **DENY** Defendant's motion to suppress (DE #31).

---

[9] Alternatively, the United States argues for application of the *Leon* good faith exception. DE #33, at 13-16; *see also* DE #46, at 7-11 (Defendant replying). Because the Court concludes that none of Defendant's arguments has traction, it declines to exhaustively analyze the application of the good faith exception or the propriety of suppression as a remedy. *See United States v. Godfrey*, 427 F. App'x 409, 412-13 (6th Cir. 2011); *United States v. Master*, 614 F.3d 236, 241-43 (6th Cir. 2010). The Court, though, perceives no justification for suppression under developed good faith exception standards in this Circuit. *See, e.g.*, *United States v. Brummett*, No. 5:13-135-DCR, 2014 WL 2118265, at *6-*8 (E.D. Ky. May 21, 2014) (explaining the standard, including the balancing test required). In sum, and given Evans's extensive, thorough affidavit buttressing Judge Thornton's warrant, the Court sees no police misconduct or disregard for the Fourth Amendment to deter through the costly act of suppression. This affidavit, in the Court's evaluation, obviously "contain[s] a minimally sufficient nexus between the illegal activity and the place to be searched," even if it hypothetically failed to cross the probable cause nexus threshold, justifying application of the good faith exception. *See Brown*, 828 F.3d at 385. The lone deficiency in the 7-page, single-spaced application is Evans's omission of dates for the August surveillance and for the heroin sample delivery. Certainly, it would have helped for him to include those dates, but Judge Thornton independently reviewed the voluminous application and issued the requested warrant. No application is perfect, perhaps, and the substantial bases within this application both validate the issuance and surely insulate the warrant from suppression. Evans invested many months in the query of Lara Salas, and he detailed those careful efforts for Judge Thornton. She, making a rational assessment of the presented papers,

20

\* \* \* \* \*

The Court issues this recommendation under 28 U.S.C. § 636(b)(1)(B). The parties should consult 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal Procedure 59(b) for specific appeal rights and mechanics. Failure to object in accordance with the Rule waives a party's right to review.

This the 12th day of October, 2017.



Signed By:
Robert E. Wier
United States Magistrate Judge

---

found probable cause. There simply is no sufficiently deliberate misconduct to deter and no adequately culpable behavior to correct, via suppression.